UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA,

–against–

17-cr-0149 (LAK)

JOSE SANTIAGO-ORTIZ,

Defendant.
------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/23/2018

# MEMORANDUM OPINION

Appearances:

> Shawn G. Crowley
> Lauren B. Schorr
> George D. Turner
> Assistant United States Attorneys
> GEOFFREY S. BERMAN
> INTERIM UNITED STATES ATTORNEY
>
> Harvey Fishbein
> Steven Edward Lynch
> *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

The matter is before the Court on defendant's motion pursuant to Federal Rule of Criminal Procedure 29 for a judgment of acquittal on Counts One, Two, and Four of the Indictment [DI 87].

*Background*

Defendant was convicted by a jury on May 15, 2018 of each of the five counts with

which he was charged[1] – that is, (1) murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count One), (2) murder while engaged in the narcotics conspiracy charged in Count Three, in violation of 21 U.S.C. § 848(e) (Count Two), (3) conspiracy to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. §§ 841(1), 841(b)(1)(A), and 846 (Count Three); (4) murder through the use of a firearm during and in relation to the narcotics conspiracy charged in Count Three, in violation of 18 U.S.C. § 924(j) (Count Four), and (5) possession of firearms in furtherance of the narcotics conspiracy charged in Count Three, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Five).[2] The three homicide counts arose from the murder of a man named Jerry Tide. The alleged racketeering enterprise and narcotics conspiracy related to a narcotics organization in which defendant was involved called the Flow Heroin Organization.

Before the case went to the jury, defendant moved, pursuant to Rule 29, "for an order of acquittal on the grounds [that] the evidence, when viewed most favorable [*sic*] to the government, is legally insufficient with respect to . . . the three homicidal [*sic*] counts, Counts 1, 2 and 4."[3] The Court reserved on the motion.[4] As the jury convicted defendant on all counts, the Court now

---

[1] DI 12 (Superseding Indictment).

[2] With respect to Count Three, the Indictment charged also that the use of heroin distributed by Santiago-Ortiz resulted in the overdose death of an individual, but the government did not proceed on this alleged death. *See* DI 69.

[3] Trial Transcript ("Tr.") at 661:3-8. Although defendant moved for a judgment of acquittal on each of the five counts, his counsel stated at trial that "the only real issue before the court is the sufficiency of the evidence with respect to the three homicide counts." *Id.* at 661:11-13. Defendant subsequently conceded the sufficiency of the evidence with respect to Counts Three and Five in his brief on this motion. DI 91 at 1 n.1. Accordingly, the Court considers the sufficiency of the evidence only with respect to Counts One, Two, and Four.

[4] Tr. at 677:8-10.

addresses his motion.

*Discussion*

*The Rule 29 Standard*

A defendant moving for acquittal under Rule 29 on the ground that the "evidence is insufficient to sustain a conviction" bears a heavy burden.[5] "A district court may enter a judgment of acquittal on this basis only if 'after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'"[6] Indeed, in order for a court to acquit, the "evidence that the defendant committed the crime alleged must be nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."[7] Moreover, in making this determination a court may not usurp the role of the jury by "substitut[ing] its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury."[8]

---

[5] Fed. R. Crim. P. 29(a).

[6] *United States v. Ghailani*, 761 F. Supp. 2d 167, 171 (S.D.N.Y. 2011) (quoting *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002); *see also United States v. Mensah*, 515 F. App'x 59, 61 (2d Cir. 2013) ("To prevail on an insufficiency of the evidence claim under Rule 29, a defendant bears the 'heavy burden' of showing that 'no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt.'" (quoting *United States v. Caracappa*, 614 F.3d 30, 43 (2d Cir. 2010))).

[7] *Ghailani*, 761 F. Supp. 2d at 171 (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)) (internal quotation marks omitted).

[8] *Id.* (quoting *Guadagna*, 183 F.3d at 130) (internal quotation marks omitted).

*The Sufficiency of the Evidence*

*Defendant's Argument and the Government's Response*

Defendant does not dispute the sufficiency of the evidence with respect to many essential facts relating to Jerry Tide's murder. On March 6, 2010, defendant's brother, Jonathan Santiago, got into an altercation with Tide at Remi's pool hall in the Bronx during which Tide slashed Jonathan's face.[9] Several months later, in the early morning hours of September 11, 2010, defendant, Jonathan, and Tide all were at the pool hall once again.[10] At some point that evening, defendant and his brother left the pool hall and went to one of the apartment buildings from which they sold heroin in order to retrieve a firearm.[11] They then returned with their drug supplier, Ramon Cruz, to the area of the pool hall. There, the two brothers confronted Tide shortly after he left the pool hall. Jonathan stated to Tide, "remember what you did to my face," and then instructed defendant to shoot Tide. Defendant opened fire and shot and killed Tide.[12]

The point of contention between the parties concerns the sufficiency of the evidence necessary to make the murder one or more of the charged federal offenses.

The statutes relied upon in Counts One, Two, and Four each require a particular nexus between the murder and the defendant's involvement in the Flow Heroin Organization.

---

[9] Tr. 59:15-63:5.

[10] *Id.* at 64:1-66:6; 151:5-154:20.

[11] *Id.* at 154:21-156:14.

[12] *Id.* 67:14-78:8; 157:16-158:7.

Specifically:

- Count One, which charged murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1), required proof that the defendant committed the alleged murder, or caused someone else to do so, with the general purpose of gaining entrance to, increasing, or maintaining his position in the alleged enterprise, here, the Flow Heroin Organization.[13]

- Count Two, which charged murder while engaged in a narcotics conspiracy in violation of 21 U.S.C. § 848(e), required proof that the defendant intentionally killed, or counseled, induced, procured or caused someone else to kill another person while engaged in the narcotics conspiracy such that the killing was related in some meaningful way to the narcotics conspiracy.[14]

- Count Four, which charged murder through the use of a firearm during and in relation to a narcotics conspiracy in violation of 18 U.S.C. § 924(j), required proof that the firearm that was used to commit the murder was used or carried by the defendant during and in relation to the narcotics conspiracy or possessed by the defendant in furtherance of the narcotics conspiracy.

Defendant's motion rests entirely on the argument that the murder of Jerry Tide was insufficiently related to the narcotics conspiracy (and thus to the racketeering enterprise) because the killing was motivated only by personal considerations arising out of the March 2010 fight between Jonathan and Tide and was entirely unrelated to the conspiracy.

The government responds that defendant "ignores the substantial evidence presented

---

[13] Maintaining or increasing his own position need not have been defendant's only or primary motive in committing the murder in order to be guilty of violating § 1959. The government needed to prove beyond a reasonable doubt only that maintaining or increasing his position in the enterprise was a substantial motivating factor in defendant's decision to participate in the murder. *United States v. Whitten*, 610 F.3d 168, 178 (2d Cir. 2010) (citing *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992)); *see also* 3 Hon. Leonard B. Sand, et al., *Modern Federal Jury Instructions* at ¶ 52-41 (2018) [hereinafter Sand, *Instructions*].

[14] It was not necessary for the government to prove that a drug-related motive was the sole, primary, or even the most important reason for the killing so long as it proved beyond a reasonable doubt that it was one of its purposes. *United States v. Dupree*, 870 F.3d 62, 78 (2d Cir. 2017) (citing *United States v. Desinor*, 525 F.3d 193, 202 (2d Cir. 2008)); *see also* Sand, *Instructions*, *supra* note 13, at ¶ 56-55.

at trial . . . concerning the Flow Heroin Organization's structure and dominance on Hughes Avenue following the murder, as well as the evolution of the defendant's relationship with Cruz directly after he killed Tide."[15]

The government points first to testimony by Anthony Ramos, who sold Flow heroin for defendant during the relevant period, that defendant and his brother were not the only dealers selling Flow heroin in or around East 178th Street and Hughes Avenue in 2010, at the time of Tide's murder.[16] They competed with rival dealers for control of the territory and for the distribution of Flow heroin.[17] That competition resulted in at least two shootouts in late 2010.[18] According to the government:

> "[I]t was against this violent backdrop that the defendant made the ultimate showing of strength, when, on September 11, 2010, he shot and killed Jerry Tide, with his [*i.e.*, defendant's] supplier, Cruz, waiting nearby. He shot Tide to avenge the disrespect shown to his brother and co-conspirators, and to defend his reputation as a ruthless drug dealer willing to 'do anything' for his Organization."[19]

The government argues that the evidence at trial was sufficient to show that defendant "secured total control of the drug territory and the distribution of . . . Flow heroin" as a result of his

---

[15] DI 95 at 12.

[16] Tr. at 120:10-127:25; 133:18-134:6, 142:17-144:19.

[17] *Id.* at 134:17-135:2; 144:20-146:10.

[18] *Id.* at 137:9-138:17; 145:11-146:10.

[19] DI 95 at 15.

shooting of Tide and the reputational impact of his action.[20] On this point, the government relies in part on the testimony of Neil Lizardi, the individual who supplied heroin to defendant's supplier, Ramon Cruz. Lizardi testified that Cruz reported to Lizardi on the individuals to whom Cruz sold heroin for street-level distribution, including defendant and his brother.[21] Lizardi testified in particular that Cruz in one such conversation told Lizardi that "people were scared of" and "respected" defendant after the shooting.[22] Additionally, Lizardi at trial read a transcript of a telephone call between himself and Cruz, which took place on August 22, 2015. During that call, Cruz reflected on the state of affairs of the Organization and, among other subjects, turned to Tide's shooting. He told Lizardi that the murder had taken place "around the time [Cruz was] getting to know" defendant and his brother and that Cruz "became closer" with defendant and his brother after the murder.[23]

The government highlights additional testimony by Anthony Ramos, who testified that following Tide's murder, for which initially Jonathan was arrested, defendant became "the boss" of the drug organization[24] at which point the amount of Flow heroin that defendant sold increased.[25]

---

[20] *Id.*

[21] Tr. at 472:23-498:5.

[22] *Id.* at 495:10.

[23] *Id.* at 530:10-13.

[24] *Id.* at 164:20-21; *see also id.* at 485:20-486:4.

[25] *Id.* at 168:20-169:3.

Ramos and Lizardi testified that defendant's former rivals no longer sold Flow heroin on East 178th Street after the murder[26] and that Cruz's only managers following the killing were defendant and his siblings.[27] Lizardi testified, moreover, that Cruz had sold Flow heroin to defendant's organization as well as to "independent, random people in other blocks close to Hughes" before the murder but that he "consolidated the operation" and made defendant his "primary distributor" thereafter.[28]

Indeed, Cruz himself was near the murder scene when it occurred and involved in the crime to a certain extent. Lizardi testified that Cruz told him on at least two separate occasions that Cruz drove defendant and Jonathan to the area of the pool hall on September 11, 2010, waited while they shot and killed Tide, and then drove them away after the murder.[29]

---

[26] *Id.* at 169:4-15.

[27] *Id.* at 484:25-485:8.

[28] *Id.* at 493:21-494:8.

Defendant moved at trial to exclude certain statements made during the August 22, 2015 phone conversation between Cruz and Lizardi, which statements were contained in GX 205T. Defendant argued that the statements were not made in furtherance of the conspiracy and therefore constituted hearsay. *See* DI 63; Tr. at 449:25-454:10. The Court concluded that the statements at issue were in furtherance of the conspiracy, denied the motion, and admitted the statements for certain limited purposes. *Id.* at 460:14-464:3.

Aside from that one exception, defendant never objected at trial to the relevance of any of the evidence related to post-shooting events. Nor does he do so here. Nevertheless, the Court observes that evidence of the post-shooting events was relevant to defendant's motive or motives with respect to the shooting. A jury may infer that one intends the natural and probable consequences of one's actions. *See, e.g., United States v. Nelson*, 277 F.3d 164, 197 (2d Cir. 2002). Accordingly, the jury here was entitled to consider whether the alleged consequences of the shooting were probative of the likely motive.

[29] Tr. at 492:11-14; 526:10-529:14.

*Application*

The evidence was sufficient to support the jury's finding that defendant murdered Tide at least in part to increase or maintain his position in the Flow Heroin Organization – in other words, with at least one motive related to the Organization – as required to convict him under Counts One and Two. It was sufficient also to support the jury's finding that defendant committed the murder with a firearm that he used or carried in relation to the Organization, as required to convict him under Count Four. The evidence therefore was sufficient to support the three homicide convictions.

The Second Circuit's decision in *United States v. Vernace*[30] persuasively weighs in favor of denying the motion. The Circuit there considered a motion for a judgment of acquittal by the defendant, Vernace, who had shot and killed one of the owners of the Shamrock Bar in Queens. Vernace – then a member of the Gambino crime family – argued that the evidence at trial had been insufficient for the jury to find that the so-called "Shamrock Murders" were related to the Gambino crime family for purposes of RICO.[31] Like the murder in this case, the shooting in *Vernace* arose from a personal dispute. One of the waiters at the Shamrock spilled a drink on the girlfriend of another Gambino associate, Frank Riccardi. Riccardi became visibly upset and, when the owners of the Shamrock attempted to calm him down, left the bar. He then went to a social club out of which the Gambinos ran a gambling operation. There he found Vernace who accompanied him back

---

[30] 811 F.3d 609 (2d Cir. 2016).

[31] 18 U.S.C. § 1962(c).

to the Shamrock. Upon entering the bar, Vernace and Riccardi shot and killed the two owners.[32]

Like defendant here, Vernace did not dispute that he fired one of the fatal shots. Rather, he contended that the murders "were not related to the activities of the Gambino crime family" and "resulted instead from a mere personal dispute over a spilled drink."[33] The Second Circuit rejected that argument. It concluded that "[f]rom the evidence, the jury could have reasonably inferred that Riccardi enlisted Vernace . . . to kill the two bar owners for disrespecting him as a Gambino associate and to uphold the reputation of the Gambino crime family."[34] It reasoned that:

> "During his interactions at the Shamrock Bar, Riccardi suffered an affront (real or perceived) to himself and to his authority as a Gambino associate, and, by extension, to the family. Vernace, in turn, helped him address the affront. That is, a reasonable jury could have concluded Vernace went so far as to commit murder in a crowded bar because such a public display related to preserving (and even enhancing) the reputation of the Gambino crime family and its members."[35]

Moreover, the Circuit concluded:

> "[T]he Shamrock Murders link back to the Gambino crime family in another way. The jury could also have reasonably concluded that Vernace participated in the Shamrock Murders to *further his own reputation*, thereby *enabling him to more effectively carry out the activities of the Gambino crime family*. The jury heard testimony that one of the goals of the Gambino crime family was to make money through illicit means. By building their own reputations, Gambino members gained respect in the street that they could directly leverage in the family's loansharking and extortion activities. For example, the Government presented a secretly recorded

---

[32] *Vernace*, 811 F.3d at 613.

[33] *Id.* at 616 (internal quotation marks and citation omitted).

[34] *Id.*

[35] *Id.*

conversation where one of Vernace's associates used the Shamrock Murders to collect loansharking debts by telling the victim that Vernace was 'the real thing' and after warning that those sorts of homicides 'happen every day.' The jury could have reasonably concluded that Vernace found it valuable to participate in the Shamrock Murders because doing so would later help him carry out other activities that benefitted the Gambino crime family."[36]

To this point, the court noted also that "Vernace [had not been] punished for participating in the Shamrock Murders – he was, indeed, ultimately entrusted with ruling authority."[37]

The Court concludes that the overwhelming parallels between *Vernace* and this case carry the day. Here, as in *Vernace*, the jury reasonably could have concluded that defendant as "a member of a criminal enterprise felt disrespected as a result of a personal dispute that arose at a bar; the defendant and other members of the enterprise gathered in territory controlled by the enterprise, armed themselves, and prepared to take action; and the defendant then returned to the bar with the other crew members to avenge that disrespect *and*, in doing so, . . . preserve and strengthen his own reputation and that of the enterprise."[38] The Court is not persuaded by defendant's arguments to the contrary. There is nothing about the "unique Mafia subculture" at issue in *Vernace*[39] that convincingly sets that case apart. Indeed, the similarities between the organized crime syndicates that inspired the enactment of RICO and drug organizations such as the Flow Heroin Organization weigh against, rather than in favor of, defendant's argument.

---

[36] *Id.* (emphasis added) (internal quotation marks and citations omitted).

[37] *Id.* at 618.

[38] DI 95 at 20.

[39] DI 91 at 8.

Defendant next argues that both Lizardi and Ramos "have substantial credibility issues" and that the video recording of the accident "shows that this was a spur-of-the-moment, unplanned encounter that developed over the span of just under two minutes."[40] But the video makes no such showing; defendant's speculative interpretation is belied by evidence in the record that defendant and his brother returned to one of the apartments from which they sold drugs to acquire a firearm after seeing Tide at the pool hall on September 10, 2011. Moreover, it is not the province of a judge to usurp the role of the jury in making credibility determinations. The jury was entitled to believe Lizardi's and Ramos' testimony.[41]

The cases to which defendant cites are inopposite. In *United States v. Bruno*,[42] the Second Circuit concluded that the evidence was insufficient to prove that two shootings were undertaken by a member of the Genovese crime family "for the purpose of gaining entrance to or maintaining or increasing [the defendant's] position" in the family.[43] Setting aside the fact that *Bruno* predated *Vernace* by twelve years, the circumstances in *Bruno* readily set it apart from this case. First, the defendant there had several personal motives for ordering the shootings, including that the victims had "'set him up' for a robbery" and that he "owed them significant amounts of

---

[40] DI 96 at 6.

[41] *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984) ("The court should not substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury.").

[42] 383 F.3d 65 (2d Cir. 2004).

[43] *Id.* at 82 (quoting 18 U.S.C. § 1959(a)) (internal quotation marks omitted).

13

money from loansharking."[44] Indeed in *Vernace*, the Second Circuit distinguished *Bruno* as involving a much stronger personal angle.[45] Moreover, the Circuit in *Bruno* highlighted "significant evidence [in the record] that [the defendant's] shooting of [the victims] was done in contravention of Genovese Family protocols and that [the defendant's] role in the Shootings actually *decreased* his standing in the Genovese Family."[46] Here, by contrast, there is significant evidence in the record showing that the opposite is true – defendant's stature in the Flow Heroin Organization increased dramatically following the murder. Finally, in *Bruno*, the individuals that the defendant had recruited to assist him in carrying out the shootings were his cousins and were not part of the Genovese crime family. Defendant here carried out the shooting at the urging of his brother, then the leading manager of their narcotics distribution business, and with the assistance of his drug distributor, Ramon Cruz.[47]

---

[44] *Id.* at 84.

[45] *Vernace*, 811 F.3d at 617 ("[W]here it was understandable in Bruno that the defendant would violently retaliate for personal reasons against two individuals – who sought to collect tens of thousands of dollars of loansharking debts from him and who he suspected had robbed him in the past – the personal angle here is far weaker and not one the jury was obliged to credit.").

[46] *Bruno*, 383 F.3d at 85 (emphasis in original).

[47] That the Second Circuit itself distinguished *Bruno* from the circumstances in *Vernace* is also telling. *Vernace*, 811 F.3d at 617-18.

Defendant's citation of *United States v. Jones*, 291 F. Supp. 2d 78 (D. Conn. 2003), similarly is unavailing. In *Jones*, the court acquitted the defendant after concluding that his shooting of a man who had insulted Jones' girlfriend had "resulted from a purely personal dispute." *Id.* at 87. As here, the government had argued that Jones' reputation in his drug distribution business was built in large part on respect as a result of various acts of violence and intimidation. The court concluded, however, that even if there was sufficient evidence to show that other acts of violence had been committed for the general purpose of maintaining or increasing Jones' position in the drug organization, there was no such evidence with

*Conclusion*

For the foregoing reasons, defendant's motion for a judgment of acquittal on Counts One, Two, and Four of the Indictment [DI 87] is denied.

SO ORDERED.

Dated:       August 23, 2018

/s/    Lewis A. Kaplan
───────────────────────
Lewis A. Kaplan
United States District Judge

---

respect to this shooting. *Id.* at 87-89.

As an initial matter, *Jones* is not controlling here. Moreover, as the government points out, it is distinguishable not least because Jones was "already the undisputed leader of his drug trafficking organization." DI 95 at 22 (citing *Jones*, 29 F. Supp. 2d at 82). Here, the evidence is sufficient to show that defendant rose considerably in the ranks of the Flow Heroin Organization after he shot Tide.